**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUSTIN PURVIS, and CORRIE PURVIS, <br><br> Plaintiffs, <br><br><br> v. <br><br> GOLDEN BELL ENTERTAINMENT, LLC, a California limited liability company, GOLDEN BELL STUDIOS, LLC, a Nevada limited liability company and MARC GOLDNER, <br><br><br> Defendants. | **No. 1:20-cv-000639** <br><br> **ECF Case** <br><br><br> **COMPLAINT** |

Plaintiffs, by and through their undersigned attorneys, CHINTA, PERDOMO, BERKS & FRATANGELO LLP, allege as and for their complaint:

## NATURE OF THE ACTION

1.      Plaintiffs created and developed a trivia game called Movie Buff ("Movie Buff").

2.      On September 4, 2016, plaintiffs and Golden Bell Entertainment, LLC ("GB Entertainment") entered into a contract for the sale, marketing, and commercial exploitation of Movie Buff and a number of spin-offs. ("First Contract").  The First Contract was replaced and superseded by a contract dated September 14, 2016 ("Second Contract"), and addendum dated November 9, 2016 ("Third Contract"), and an addendum dated July 16, 2017 ("Fourth Contract"). All four agreements will collectively be referred to as "The Contracts."

3.      In 2017, GB Entertainment and Justin Purvis entered into a separate employment agreement ("Employment Agreement").

4.      In 2018, GB Entertainment repudiated The Contracts in writing.

5.     GB Entertainment materially breached The Contracts by failing to exploit the Movie Buff spin-offs and failing to pay plaintiffs monies due under The Contracts.

6.     GB Entertainment and Marc Goldner violated the Fair Labor Standards Act by failing to pay Justin Purvis wages owed for hours worked under the Employment Agreement.

## THE PARTIES

7.     Justin Purvis ("Justin") was a New Jersey resident until October of 2016, and a Kentucky resident thereafter.

8.     Corrie Purvis ("Corrie") was a New Jersey resident until October of 2016, and a Kentucky resident thereafter.

9.     Upon information and belief, defendant GB Entertainment is a California limited liability company whose principal place of business is in Roslyn, New York, and transacts business in New York.

10.     Upon information and belief, defendant Golden Bell Studios, LLC ("GB Studios"), is a Nevada limited liability company whose principal place of business is in Roslyn, New York, and transacts business in New York.

11.     Upon information and belief, defendant GB Entertainment transferred or assigned some or all of its rights under The Contracts to GB Studios.

12.     Upon information and belief, the members of GB Entertainment and GB Studios are Marc Goldner ("Goldner"), Rachael Korsen ("Korsen"), and Robert Gross ("Gross").

13.     Upon information and belief, Gross is an Ohio resident.

14.     Upon information and belief, at all relevant times, Goldner was a New York resident and currently resides in Ohio.

15.     Upon information and belief, Korsen is a New York resident.

16.     Upon information and belief, Goldner was at all relevant times the controlling and majority owner or member of GB Entertainment and GB Studios.

17.     Upon information and belief, Goldner was at all relevant times an officer of GB Entertainment and GB Studios.

18.     Upon information and belief, Goldner had at all relevant times authority and control over GB Entertainment's daily business operations, including but not limited to the hiring and firing of employees, working conditions, and compensation.

19.     Upon information and belief, Goldner operates GB Entertainment and GB Studios interchangeably in business dealings, including written communications, negotiations, payments, and governmental filings.

20.     GB Studios is a necessary party only to the extent that any judgement or order affecting GB Entertainment's interests may affect GB Studios' interest in and to any agreement or license it has with GB Entertainment.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA").

22.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists. Plaintiffs are Kentucky residents. GB Entertainment's and GB Studios' principal place of business is in New York, and Goldner resides in Ohio.

23.     Venue is proper in this District under 28 U.S.C. § 1391(a) as a substantial part of the events and/or omissions giving rise to plaintiffs' claims occurred in this district

24.     Defendants are subject to the Court's personal jurisdiction, *inter alia*, pursuant to NY CPLR 302.

## FACTUAL BACKGROUND

A.     **Conception and success of Movie Buff**

25.     In 2005, Justin and Corrie developed the idea and concept for Movie Buff.

26.     In 2014, Justin and Corrie created a working prototype of Movie Buff and ran a successful Kickstarter campaign to produce its first run, raising approximately $25,000.

27.     In 2015, plaintiffs received Movie Buff's first print run of 1,000 copies.

28.     Plaintiffs then began marketing, promoting, and selling Movie Buff to the public by attending conventions, trade shows, visiting local game shops, on their own website, and by other means.

29.     Through their own efforts and with a minimum of paid advertising, Justin and Corrie quickly sold their entire first print run of 1,000 copies and earned more than $20,000.

30.     In 2015, plaintiffs self-financed a second print run of 5,000 copies of Movie Buff.

31.     They sold 40% of that print run within 90 days.

32.     They did this, in part, by increasing their regular attendance at trade shows and conventions.

33.     Justin and Corrie earned approximately $40,000 from Movie Buff in first three quarters of 2016.

34.     Movie Buff soon became their primary source of income.

35.     Because of the success of Movie Buff, Justin and Corrie started working on a sequel and named it TV Buff ("TV Buff").

36.     TV Buff was one of many variations on Movie Buff that plaintiffs intended to develop.

37.     In September of 2016, Justin and Corrie had a new Kickstarter campaign ready to launch for TV Buff when they attended the Baltimore Comic Con.

38.     The Baltimore Comic Con event is a trade show open to the public and members of the gaming industry where game makers like Justin and Corrie market and sell their games, meet and network with other industry members and fans, and discuss and conduct business with each other.

**B.      Justin and Corrie Meet Goldner and Sign Contracts**

39.     Goldner approached plaintiffs at the Baltimore Comic Con and spoke with Corrie about partnering to produce future print runs of Movie Buff and any sequels they planned to launch, such as TV Buff.

40.     Goldner spoke convincingly about his companies, experience distributing games similar to Movie Buff and TV Buff, as well as defendants' financial and distribution capabilities.

41.     Justin and Corrie were interested in Goldner because they believed that working with a production and distribution company would at a minimum, guarantee their current income and free them up to spend more time developing and designing future games and sequels.

42.     Justin and Corrie subsequently met with Korsen and Gross.

43.     Goldner, Korsen, and Gross each told Justin and Corrie about GB Entertainment's industry successes and connections in an effort to convince them to do business together.

44.     During the Baltimore Comic Con in September 2016, Goldner specifically told Justin and Corrie that he and his companies had all of the necessary money, connections,

knowledge, and capabilities to exceed their current income and meet all of their financial and business goals and objectives.

45.      Also in September 2016, at a follow up meeting during the Baltimore Comic Con, Goldner told Justin and Corrie that his companies had a multi-millionaire mentor, or benefactor, or investor that was extremely well-connected in the manufacturing, marketing, and publishing industries.

46.      During this conversation, Goldner told plaintiffs that his "benefactor" would make sure that GB Entertainment had the necessary financial resources to successfully develop and publish Movie Buff, and any sequels and spin-offs.

47.      During the same conversation, Goldner told Justin and Corrie that he was a successful and experienced game publisher who was savvy in the industry, had multiple manufacturing connections, superior marketing skills, and unlimited funds. Goldner represented to plaintiffs that money was no object due to the fact that he recovered large amounts of money from lawsuits and assured them that all of their financial needs would be met.

48.      On September 4, 2016, plaintiffs and GB Entertainment signed the First Contract.

49.      The games and properties covered by the First Contract were "Movie Buff," "TV Buff," their ties-ins, spinoffs, and sequels.

50.      Plaintiffs relied on Goldner's statements, promises, and representations, in deciding to enter into the First Contract.

51.      The First Contract provided that Justin and Corie owned 40% of their copyrights in the works and 15% of the net profits from sales of the properties included in the agreement.

52.      About a week after the Baltimore Comic Con Goldner went to Plaintiff's home to discuss their future collaboration. Plaintiffs told Goldner how well Movie Buff had done on

Amazon the previous year with no advertising and Goldner explained his strategy to skyrocket the Amazon sales. Goldner also promised plaintiffs during the meeting that if they signed a contract with GB Entertainment, the company could and would finance additional print runs of Movie Buff, including, without limitation for the 2016 holiday season.

53.     Plaintiffs informed Goldner that they had sufficient Movie Buff inventory for the 2016 holiday season and that they required and need GB Entertainment to arrange and pay for a fresh and new print run to satisfy customer demand.

54.     Goldner represented to Justin and Corrie that GB Entertainment had the required finances, connections and infrastructure (printers, storage etc.) to secure timely a new print run of Movie Buff for the upcoming 2016 holiday season and would do so.

55.     Justin and Corrie were impressed and convinced by Goldner's statements and representations, and so they decided to do business with him.

56.     However, upon information and belief, at the time Goldner promised them it would arrange and pay for a new print run, defendants did not have the money to finance it nor did they have the business connections or skills to effectively market and exploit Movie Buff or its sequels or spin offs.

57.     On September 14, 2016, Justin, Corrie, and Purvis Enterprises, on one side, and GB Entertainment, on the other side, signed the Second Contract which superseded the First Contract.

58.     The Second Contract added additional properties to the agreement, stated that plaintiffs owned 40% of their copyright and trademark rights, and that plaintiffs were entitled to 15% of the net profits from sales of the properties included in it.

7

59.     Aside from the First and Second Contract, GB Entertainment and plaintiffs entered into an oral agreement whereby GB Entertainment purchased approximately 3,000 copies of plaintiffs' Movie Buff inventory for $9,000, while plaintiffs retained 1,500 of the copies to sell.

60.     On November 9, 2016, Justin and Corrie signed the Third Contract.

61.     The Third Contract assigned 100% of plaintiffs' trademark and copyright interests in  "Movie Buff", "TV Buff", "Music Buff," "Comic Book Buff", "Video Game Buff", "History Buff" and other similarly named works to GB Entertainment ("Buff Works").

62.     On July 16, 2017, Justin, Corrie, and GB Entertainment signed the Fourth Contract.

63.     The Fourth Contract required GB Entertainment to pay Justin and Corrie 17% of the net profits from the sale and commercial exploitation of Movie Buff.

64.     The Fourth Contract set plaintiff's royalties at 15% of the net profits for all Buff Works except Movie Buff.

65.     The First Contract, Second Contract, and Third Contract required GB Entertainment to provide Plaintiffs with at least 1,000 free copies of each print run of each "Buff" game title produced by GB Entertainment  at the time of its release so that Plaintiffs could sell these copies independently and keep 100% of the profits.

66.     The Fourth Contract required GB Entertainment to provide Plaintiffs with at least 100 free copies of each print run of each "Buff Works" title produced by GB Entertainment at the time of its release so that Plaintiffs could sell these copies independently and keep 100% of the profits.

**C.        GB Entertainment's Fails to Deliver Print Run of Movie Buff**

67.     On November 26, 2016, GB Entertainment launched a Movie Buff expansion on Kickstarter, and it was promptly and fully funded.

68.     GB Entertainment, however, failed to timely arrange for and obtain the print run required under the Kickstarter campaign.

69.     The Kickstarter campaign pre-orders were partially fulfilled in sometime in 2018, yet the bonus features packs were not sent out until January 2020.

70.     By December 2016, the available inventory of Movie Buff games was running out and GB Entertainment neglected to order the next print run of the game to meet customer demand.

71.     Goldner asked plaintiffs to use 1000 of their 1500 copies of Movie Buff to sell to customers during the holiday rush.

72.     Goldner promised to replace the 1,000 by January 2017.

73.     Justin and Corrie agreed to this request expecting the replacement as promised. However, GB Entertainment did not replace the copies until August 2017, when the 2016 holiday print run was finally ready, and plaintiffs also lost the income from those sales.

**D.        Justin's Employment Agreement**

74.     In February 2017, Goldner approached Justin and offered him a job as an employee of GB Entertainment.

75.     On February 22, 2017, GB Entertainment and Justin signed the Employment Agreement, and Justin began work as the company's Editor in Chief of GB Entertainment's board game division (the "Employment Agreement").

76.     Justin's duties under the Employment Agreement included, but were not limited to, gathering licensing opportunities, finding new content, playtesting, editing, attending

conventions, managing games with the company, talking with creators, sales, representing the company with respect to certain properties, and any other duties determined by the company.

77.     The Employment Agreement stated that Justin's work product and output was work for hire within the meaning of 17 U.S.C. § 201.

78.     The Employment Agreement did not specify Justin's rate of pay, pay period, overtime rate of pay, deductions, hours and days of work, or rest or break periods.

79.     Pursuant to paragraph 1.O of the Employment Agreement, Justin's salary was meant to be "pegged with being on par with similar related position at competing corporations for editors in chief gaming divisions."

80.     The Employment Agreement specified that a portion of Justin's compensation was to be a percentage of sales and income derived from certain specified work activities, including, 20% of retail sales for "non-Buff" games from convention sales that he attended as Editor in Chief, 8% of all gross sales on any sales brokered by him, and 1% net profits in new properties he brought to the company.

81.     During his employment with GB Entertainment, Justin brought nearly one hundred new works or new properties to GB Entertainment.

82.     The Employment Agreement did not state, specify, or imply that Justin's sole or exclusive compensation was to be a percentage of sales and income derived from certain specified work activities.

83.     The Employment Agreement did not require Justin to report to or work at any particular location.

84.     The Employment Agreement stated that it was to be interpreted under New York law, and that any litigation arising from it was to be pursued in New York.

85.     GB Entertainment and Goldner did not inform Justin of his FLSA wage and hour rights or post the required notices.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

86.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein again at length.

87.     Justin and Corrie have fully performed their obligations to GB Entertainment under The Contracts.

88.     GB Entertainment promised to pay Justin and Corrie 17% of the net profits from the revenue derived from sales of Movie Buff.

89.     From September of 2016 to the present, GB Entertainment received money and income from sales of units or copies of Movie Buff.

90.     From September of 2016 to the present, GB Entertainment made a net profit from sales of units or copies of Movie Bluff.

91.     From September of 2016, to the present, GB Entertainment breached The Contracts by failing to disclose the details of Movie Buff sales and to pay Justin and Corrie their share of the net profits from the revenue derived from sales of Movie Buff.

92.     Justin and Corrie reasonably believe that based on sales of Movie Buff made by them before September of 2016, the total number of Movie Buff units sold by GB Entertainment from September of 2016 to the present time is at least 7,500 per year, or 22,500 in total.

93.     Additionally, plaintiffs were entitled to receive at least 1,000 units for each print run of Movie Buff and the Buff Works.

11

94.     GB Entertainment is currently selling Movie Buff on GB Studios' website for $24.95.

95.     GB Entertainment's breach of its obligations under The Contracts caused Justin and Corrie money damages as follows: no less than 22,500 total unit sales at no less than $24.95 per unit multiplied by not less than 15%, for a total due and unpaid of at least $84,206.25.

96.     GB Entertainment's breach is ongoing since it continues to make additional sales.

97.     No part of this amount has been paid despite due demand having been made by Justin and Corrie prior to the commencement of this action.

98.     GB Entertainment has further materially breached The Contracts by failing to exploit the properties TV Buff and other Buff Works, thus depriving plaintiffs of their rights to profit from their work.

99.     GB Entertainment materially breached The Contracts by failing to properly manage Kickstarter campaigns for the Buff Works.

100.    GB Entertainment materially breached The Contracts by failing to pay plaintiffs the required net profits from the sale of the Buff Works which defendant failed to commercially exploit.

101.    All of these breaches were willful and intentional, and GB Entertainment knew the breached would cause financial harm to Justin and Corrie by depleting their primary source of income at a time when the Buff Works were at their peak popularity.

102.    GB Entertainment's breaches are all material because the core rationale and purpose of each of the contracts was for Justin and Corrie to maximize the publication, distribution, sales, and commercial exploitation of Movie Buff, TV Buff and their other Buff Works.

103.    On or about February 2018, GB Entertainment repudiated The Contracts in writing by stating it had stopped exploiting TV Buff and other Buff Works.

104.    As a result of GB Entertainment breach, Justin was damaged in an amount to be determined at trial, but not less than $84,000.00.

105.    As a result of GB Entertainment's material breaches and written repudiation of The Contracts, plaintiffs demand rescission of The Contracts.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Employment Contract)

106.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein again at length.

107.    GB Entertainment breached the Employment Agreement by failing to pay Justin the agreed upon compensation, including his salary, 20% of retail sales for "non-Buff" games from convention sales that he attended as Editor in Chief, 8% of all gross sales on any sales brokered by him, and 1% of net profits in new properties he brought to the company.

108.    GB Entertainment's breach was willful and with the knowledge that it would cause financial harm to Justin by failing to pay the agreed upon compensation for his work.

109.    As a result of GB Entertainment's breach, Justin was damaged in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of Fair Labor Standards Act 29 U.S.C. §§ 201 et seq.)

110.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein again at length.

111.    At all relevant times, GB Entertainment and Goldner were Justin's employer within the meaning of 29 U.S.C. § 203(d).

112. At all relevant times, GB Entertainment and Goldner have been, and continue to be "employers" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of 29 U.S.C. § 203.

113. Upon information and belief, Goldner was at all relevant times the controlling and majority owner or member of GB Entertainment.

114. Upon information and belief, Goldner was at all relevant times an officer of GB Entertainment.

115. Upon information and belief, Goldner had at all relevant times authority and control over GB Entertainment's daily business operations, including but not limited to the finances, business and employment policies, hiring and firing of employees, working conditions, and compensation.

116. Upon information and belief, Goldner at all relevant times represented GB Entertainment in its relationships with third parties such as collaborators and vendors, and exercised full control over the general business affairs of GB Entertainment and its employees, including Justin.

117. Justin began his employment on February 22, 2017.

118. Justin reported primarily to Goldner and received instructions directly from him.

119. Justin worked from his home in Kentucky for 7 to 8 hours each day, seven days per week and was on standby for additional 1-2 hours per day.

120. During his employment, Justin's duties were gathering licensing opportunities, finding new content, playtesting, editing, attending conventions, managing games with the company, talking with creators, sales, representing the company with respect to certain properties, and any other duties determined by Goldner directly.

121.     Justin resigned his position with GB Entertainment in December 2017, because he was never paid for his work.

122.     The federal and Kentucky minimum wage in 2017 was $7.25 per hour.

123.     Justin worked 40 weeks, for approximately 49 hours each week, for a total of at least 1,960 hours of work for Goldner and GB Entertainment.

124.     The total amount of money that Justin earned under the applicable labor statute was at least $14,210.

125.     GB Entertainment and Goldner never paid Justin for any of his worked hours.

126.     GB Entertainment and Goldner did not provide a time clock, sign in sheet, or any other method for Justin to track his time worked.

127.     GB Entertainment and Goldner failed to keep full and accurate records of Justin's hours and wages.

128.     GB Entertainment and Goldner knew that Justin would suffer economic injury as a result of the nonpayment of wages and committed the above alleged acts knowingly, intentionally and willfully.

129.     GB Entertainment and Goldner did not inform Justin of his wage and hour rights under the FLSA or post the required notices.

130.     GB Entertainment and Goldner failed to pay Justin at the applicable minimum hourly rate, in violation of 29 U.S.C. § 206(a).

131.     GB Entertainment and Goldner failure to pay Justin at the applicable minimum hourly rate was willful within the meaning of 29 U.S.C. § 255(a).

132.     Justin has been damaged in an amount to be determined at trial, but not less than $14,210.00.

133.    Justin is entitled to liquidated damages within the meaning of 29 U.S.C. § 216.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraudulent Inducement)

134.    Plaintiffs repeat and reiterate the allegations contained in paragraphs 1 through 95 as though fully set forth herein.

135.    For purposes of this cause of action, all references to "defendants" shall mean Goldner or GB Entertainment or both of them.

136.    In September of 2016 at the Baltimore Comic Con event, Goldner, in his capacity of an officer of GB Entertainment, approached plaintiffs with a proposal to publish and distribute Movie Buff and any sequels they planned to launch, such as TV Buff.

137.    At the time of Goldner's approach, plaintiffs were ready to launch a brand new "Movie Buff" Kickstarter campaign.

138.    On or about September 2016, Goldner specifically told Justin and Corrie that he and his companies had all of the necessary money, connections, knowledge, and capabilities to meet all of their financial and business goals and objectives.

139.    Upon information and belief, Goldner and GB Entertainment knew this statement was false when it was made because at that time he and his company had no meaningful knowledge, connections, or capabilities in the tale top card game industry.

140.    Upon information and belief, Goldner and GB Entertainment knew this statement was false when it was made, because at that time he and his company had no meaningful financial resources.

141.    In September 2016, at the Baltimore Comic Con,  Goldner told Justin and Corrie that his companies had a multi-millionaire mentor, or benefactor, or investor that was extremely well-connected in the manufacturing, marketing, and publishing industries.

16

142.    Upon information and belief, Goldner and GB Entertainment knew this statement was false when it was made, because at that time he and his company had no such person or entity available to them who possessed meaningful connections in the manufacturing, marketing, and publishing industries.

143.    During this conversation, Goldner told them that his "benefactor" would make sure that GB Entertainment had the necessary financial resources to successfully develop and publish Movie Buff, and any sequels and spin-offs.

144.    Upon information and belief, Goldner and GB Entertainment knew this statement was false when it was made, because at that time he and his company had no such person or entity available to them who possessed meaningful financial resources and who would make them available to Goldner and GB Entertainment for the purpose of commercially exploiting Movie Buff and any sequels or spin-offs.

145.    In addition, during the conversations at the Baltimore Comic Con, Goldner told Justin and Corrie that he was a successful and experienced game publisher who was savvy in the industry, had multiple manufacturing connections, superior marketing skills, and unlimited funds. He stated that money was no object due to the fact that he recovered large amounts of money from lawsuits and assured them that all of their financial needs would be met.

146.    Upon information and belief, Goldner and GB Entertainment knew this statement was false when it was made, because at that time he and his company had no meaningful knowledge, connections, or capabilities in the tale top card game industry, and because at that time he and his company had no meaningful financial resources.

147.    About a week after the Baltimore Comic Con, Goldner went to Plaintiffs' home and during their meeting promised plaintiffs that if they signed a contract with GB Entertainment,

the company could and would finance additional print runs of Movie Buff, including but not limited to the 2016 holiday season.

148.     Goldner and GB Entertainment knew this statement was false when it was made, because at that time he and his company had no meaningful financial resources available for the purpose of commercially exploiting Movie Buff.

149.     Upon information and belief, at the time Goldner promised them it would arrange and pay for a new print run, defendants did not have the money to finance it nor did they have the business connections or skills to effectively market and exploit Movie Buff and the Buff Works.

150.     These statements represented  presently existing facts and are material because they related directly to the core of the proposed business relationship, which was to timely secure the next print run of Movie Buff for the upcoming 2016 holiday season, publish, market, and commercially exploit TV Buff and the other Buff Works, and secure distribution contracts with large retailers for plaintiffs' games.

151.     These statements involved a presently existing fact known only by Goldner or were not facts plaintiffs could reasonably expect to lean through investigation, and therefore plaintiffs could reasonably expect to rely upon them.

152.     Defendants' representations were false and were made for the purpose of inducing plaintiffs to sign The Contracts.

153.     Upon information and belief, defendants' intent was to commercially exploit plaintiffs' property, misappropriate the revenue, and pay plaintiffs no money.

154.     Plaintiffs reasonably relied on Goldner's false representation.

155.     Plaintiffs would not have signed The Contracts but for defendants' false representations.

156.    As a result of plaintiffs' reasonably reliance on defendants' false and reckless representations, plaintiffs suffered money damages of at least $84,206.25, with the exact amount to be proven at trial.

157.    As a result of plaintiffs' reasonably reliance on defendants' false and reckless representations, plaintiffs demand rescission of The Contracts.

**WHEREFORE**, plaintiffs respectfully request that this Court:

1.    On the First Cause of Action, award plaintiff money damages in the approximate amount of not less than $84,206.25, with the exact amount to be proven at trial;

2.    On the First Cause of Action, enter an order rescinding each of the contracts entered into between the parties other than the employment agreement;

3.    On the Second Cause of Action, award plaintiff money damages in an amount to be determined and proven at trial;

4.    On the Third Cause of Action, award plaintiff money damages in an amountof not less than $14,210, wihth the exact amount to be determined and proven at trial;

5.    On the Third Cause of Action, award plaintiff liquidated damages within the meaning of 29 U.S.C. § 216.

6.    On the Fourth Cause of Action, award plaintiff money damages in the approximate amount of not less than $84,000, with the exact amount to be proven at trial;

7.    On the Fourth Cause of Action, enter an order rescinding each of the contracts entered into between the parties other than the employment agreement;

4.    Awarding plaintiffs legal fees, cost, and disbursements; and

5.     Granting plaintiffs such other and further relief as to the Court is just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demands a trial by jury pursuant to FRCP 38.

Dated:  New York, New York
        February 5, 2020

CHINTA PERDOMO BERKS &
FRATANGELO, LLP

Francelina M. Perdomo (# FP-4429)
Antoaneta Tarpanova (#AT-2387)
17 State Street, Suite 4000
New York, NY 10004
fperdomo@chintaperdomo.com
atarpanova@chintaperdomo.com